**CROOK et al. v. UNITED STATES.**

Nos. 46000, 46269.

United States Court of Claims.

Dec. 2, 1952.

Prentice E. Edrington, Washington, D. C., for plaintiffs. William B. Wolf, Washington, D. C., was on the briefs.

C. Blake Townsend, New York City, with whom was Asst. Atty. Gen. Holmes Baldridge, for defendant. T. Hayward Brown, Washington, D. C., is on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

These cases are before us on defendant's motion for a new trial. In both suits, numbered 46000 and 46269, plaintiffs seek compensation for the infringement of United States Patent No. 1,645,643, issued October 18, 1927, to Louis H. Crook and Herman Jakobsson. The two suits cover different periods of infringement.

The cases were heretofore submitted to the court on the question of the defendant's liability, reserving the question of the amount to be awarded, if any. We held in an opinion delivered on June 6, 1949, 84 F.Supp. 173, 113 Ct.Cl. 595, that claim four of the patent was valid and had been infringed. The cases were then referred to Commissioner Gordon to take proof on the amount of compensation to which the plaintiffs were entitled.

Subsequently, on June 12, 1950, a motion for a new trial was filed under section 2515(b) of Title 28 U.S.C., which reads:

"(b) Such court [the Court of Claims], at any time while any suit is pending before it, or after proceedings for review have been instituted, or within two years after the final disposition of the suit, may grant the United States a new trial and stay the payment of any judgment upon satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done the United States."

In its motion defendant claims that since our former decision it had discovered a British patent which it claims anticipated the plaintiffs' patent, and it also claims that a certain publication by Marconi's Wireless Telegraph Co. Ltd., anticipated plaintiffs' patent.

Defendant's motion for a new trial was granted, and the case was remanded to Commissioner Gordon to take proof relative to the alleged newly discovered evidence.

The Commissioner has made his report, in which he found that the British patent and the disclosure in the handbook entitled, "Marconi Aircraft Telegraph and Telephone Apparatus: Its Installation, Testing and Maintenance," prepared and printed in 1921 by Marconi's Wireless Telegraph Co. Ltd., invalidated claim 4 of Crook's patent.

Exceptions were taken to the report, briefs were filed, and the case has been argued before the court.

Plaintiffs' patent, which hereinafter will sometimes be referred to as the "Crook patent," was on a device which they claimed eliminated in whole or in part interference

with radio reception in airplanes and automobiles. All of Crook's claims, except claim four, related to a completely insulated ignition system. The defendant's alleged infringing structure was not completely insulated and, therefore, we held it did not infringe these claims of Crook's patent. However, claim 4 of Crook's patent was broad enough to cover an ignition system in which only the high tension leads from the ignition generator to the spark plugs were insulated.

Crook's patent provided for shielding the ignition system. The generator was shielded and the wires from the positive pole of the generator to the spark plugs were shielded, but under claim four there might be a ground at the spark plug; but, notwithstanding this ground, Crook alleges that interference with radio reception was nevertheless prevented, because a low resistance return path for the high frequency electrical current was provided along the inner surface of the shield, which was attached to the return pole of the magneto, and, hence, that no electrical current, or, at any rate, an unsubstantial amount of electrical current, returned through the engine block, because the engine block offered greater resistance than the shield. The electrical waves which emanated from such part of the current as returned through the engine block, if any, were not sufficient to interfere with radio reception.

Defendant's alleged infringing structure also was completely insulated, except for the ground at the spark plugs and the ignition generator, but it also provided a means of return for the electrical current through the inner surface of the outer conductor or shield; and, hence, we held that it infringed claim 4 of the Crook patent.

Defendant now alleges that the British patent issued to Lefroy anticipated claim 4 of Crook's patent, because, it says, this patent provided for a return for the current through the inner surface of the shielding. That part of the specifications of the Lefroy patent which explains Figure 1, in part, is as follows:

"The conductor 6 for connecting one terminal of the condenser to the rotary contact of the distributor, and the conductor $6^1$ for connecting the fixed contact of the distributor to the sparking-plug, and the conductor 7 for connecting the sparking-plug, to the other terminal of the condenser, preferably are of the concentric-core type, the inner conductor $6^1$ being connected to the insulated or to one insulated terminal of the sparking-plug, and the outer conductor 7 forming the return lead. This arrangement of conductor has no external field and thus avoids a considerable amount of jamming."

Figure 1 is reproduced below:

FIG. I.

Under this specification a ground to the engine block is permissible, because, it says, "the inner conductor 6¹ being connected to *the insulated* or to one insulated terminal of the sparking-plug." Since this specification contemplates one terminal at the spark plug which is insulated, it necessarily implies that the other terminal was not insulated. This clause refers to two different kinds of systems. One system contemplates the complete insulation of the spark plug, because the specification prescribes the connection of conductor 6¹ to "*one* insulated terminal of the sparking-plug." Since this contemplates the connection to *one* of the insulated terminals, it necessarily implies that the other terminal is also insulated. But the clause also prescribes the connection of the conductor 6¹ to *the* insulated * * * terminal of the sparking-plug." Since it is provided that this conductor should be connected with *the* insulated terminal, it necessarily implies that the other terminal is not insulated.

Also, the specification, on page 1, line 72 to 76, reads:

"Each sparking plug *preferably* has two insulated electrodes so that the whole high tension circuit is insulated from the metal work of the aircraft, which further eliminates jamming."

While the specification says that it is preferable to insulate both electrodes of the spark plug, it is not so restricted. Since the specification says it is preferable to do so, it is to be implied that it is not necessary to do so.

The Lefroy patent, therefore, would seem to envisage both a completely insulated system and one where one of the terminals of the spark plug was not insulated. It is similar to the Crook patent in this respect. This is further emphasized by a comparison of claims 7 and 8 of the Lefroy patent. Claim 8 reads as follows:

"An ignition system or apparatus as claimed in any of the preceding claims, wherein the sparking plug has two insulated electrodes so that the whole high tension circuit is insulated from the metal work of the engine."

Its phraseology is thus limited to a completely insulated ignition system. Claim 7 of the Lefroy patent, however, reads as follows, and is sufficiently broad in scope to cover both a completely insulated ignition system and one which is grounded at the terminal of the spark plug:

"An ignition system or apparatus as claimed in any of the preceding claims, wherein the conductors for connecting the parts of the apparatus are of the concentric-core type, to avoid the production of an external field."

Claim 4 of Crook's patent, like claim 7 of Lefroy's patent, is sufficiently broad to cover both an insulated system and one that was not completely insulated. Therefore, insofar as this feature of the Crook patent is concerned, the Lefroy patent, issued on June 18, 1925, anticipated it.

Does the Lefroy patent provide for a return of the current along the inner surface of the shield?

In our former opinion in this case we said:

"Crook claimed his invention gave superior results because the high frequency current returned to the generator along the inner surface of the shield, due to capacity and 'skin effect', and, hence, he says that by making the shield thick enough all emanations from the system can be prevented. Putting it in technological language, he says that if the shield is made thick enough you acquire an equipotential surface on the outer portion of the shield; that is to say, no high frequency current traverses the outer surface of the shield and, hence, no high frequency waves are emitted therefrom and, therefore, there is no radio interference." 84 F.Supp. 173, 174, 113 Ct. Cl. 595, 632.

Later we said:

"This fourth claim [of the Crook patent] is based on providing a return for the current along the walls of the enclosing structure. Such a return is the feature that distinguishes this claim from the prior art, and it is an essential part of it. Indeed, it is the only im-

provement his invention makes over the prior art." 84 F.Supp. 173, 175, 113 Ct.Cl. 595, 634.

The substance of this is that Crook provided a structure for returning the high frequency current along the inner walls of the shield rather than through the engine block. Lefroy, however, had previously disclosed the same idea. In the specification quoted above, he said: "and the outer conductor 7 forming the return lead." The conductors 6, 6¹ and 7, Lefroy says, "preferably are of the concentric-core type." In other words, conductors 6 and 6¹ run within conductor 7, and conductor 7 forms the return lead from the spark plug back to the generator. This specification contemplated an inner conductor running from the generator to the spark plugs, and an outer concentric conductor returning the current from the spark plug to the generator. Lefroy says, "This arrangement of conductor has no external field and thus avoids a considerable amount of jamming."

Lefroy says that this arrangement "has no external field." This is tantamount to Crook's claim that you have an equipotential surface on the outer portion of the shield. In each instance this is an inherent functioning of concentric conductors with respect to high frequency currents.

Lefroy's system, grounded or insulated, provided for a return for the current along the inner surface of the shield, and it had no external field. This was the essence of claim 4 of the Crook patent.

It is true that Lefroy says nothing about shielding the generator or distributor, but such shielding was something well known in the art and it was evidently contemplated by Lefroy because in his specification he states, "Radiation may be further prevented by suitable screening." He further states, with reference to his embodiment shown in Figure 2, not herein reproduced, that—

"The sparking-plug 4–5 and the transformer 8–9 are preferably built together with the inductance 11 and capacity 10 as a compact unit, which may be surrounded with a metal sheath or shield which acts as a screen to prevent radiation by currents of either high or low frequency."

That there was nothing new in shielding the generator or distributor, see findings 39, 41 and 42.

The next question is whether the Crook patent was anticipated by the Marconi publication.

On page 14 of the handbook entitled, "Marconi Aircraft Telegraph and Telephone Apparatus: Its Installation, Testing and Maintenance," prepared and printed in 1921 by Marconi's Wireless Telegraph Co. Ltd., there appears a drawing setting forth a method of "ignition screening." It shows a shielded magneto and distributor, and a shielding for the wires leading therefrom to the several spark plugs. From looking at this diagram alone, it is not clear whether it is designed to cause the current to return through what is called the "metallic sheath" or through the engine block. While the text makes no reference to the drawing, both the drawing and the text relate to "magneto interference" and should be construed together. On page 19, under the heading, "Engine Screening— The Final Cure," the handbook says that the following system is advised for "overcoming the trouble." It says:

"The principle employed is to screen completely the ignition system of the engine. * * *

"* * * The problem consists of three main parts. There is, in the first place, the employment of the proper type of screened ignition wire; in the second place, there is the screening of the sparking plugs themselves; and in the third place, there is the constructing of a shield or screen round the magnetos. Probably the most difficult problem is that of the screened sparking plug. In co-operation with the Robinhood Engineering Works, however, a very effective screened aero plug of the well-known K. L. G. type has been evolved. The procuring of the proper type of cable is, of course, quite a straight-forward proposition, and the only remaining problem is that of screening the mag-

neto itself. This is a problem which is best solved either by the engine designers or by some method improvised to meet each individual case. It is obviously impossible to standardize where many types of fittings and types of magnetos exist. If, however, cases arise where it is impossible owing to restricted space to construct a metal case surrounding the magneto or the distributor, an effective method will be to link the base of the magneto with each of the incoming ignition wires by a fairly broad strip (say, an inch in width) of copper gauze, connecting the braiding of each lead with the framework of the engine immediately at the base of the magneto.

"These bonding strips should be kept as short as possible and *their function will consist of providing a low resistance return path for the oscillations set up in the ignition system.* If magneto covers are not used the fitting of these bonding strips is absolutely essential, and should be very thoroughly carried out." [Italics ours.]

From this and the drawing it would appear that it was intended for the current to return through the shield. This would seem to be true whether or not both terminals of the spark plugs and the magneto were insulated. With respect to the shielding of the spark plugs, the Marconi publication says, "Probably the most difficult problem is that of the screened sparking plug. In cooperation with the Robinhood Engineering Works, however, a very effective screened aero plug of the well-known K. L. G. type has been evolved."

The details of the screened plug are shown in an illustration on page 19 of the Marconi handbook and consist of a conical metal shield extending between the exterior braided shielding around the ignition wire and the external metal shell which screws into the engine block. Electrical continuity is thus established between the braided shielding of the ignition cable, the outer metal portion of the spark plug, and the engine block into which the spark plug is screwed. The metallic shields shown in Figure 2 and which enclose the ignition wire are shown connected to the magneto cover described in the handbook as "a metal case surrounding the magneto or the distributor." Such disclosure provides a return path for the ignition current through the shielding of the spark plug back to the magneto. If any part of the ignition system such as the magneto was not screened, it was still intended that the current should return along the shield, because it provides for linking the "base of the magneto with each of the incoming ignition wires by a fairly broad strip (say, an inch in width) of copper gauze." It says that the function of these bonding strips is to provide "a low resistance return path for the oscillations set up in the ignition system."

Figure 2 on page 14 indicates that the shield is connected to the engine block and not to any electrode of the spark plug; but considering it in connection with the portion of the handbook quoted above together with the details of the plug shown on page 19, it would seem that it was intended that the current should return along the shield.

If the magneto was not shielded and these bonding strips were not used, then the current would have to return from the spark plugs to the magneto by way of the engine block; but, by use of the bonding strips a path of return of lower resistance than that of the engine block was provided along the shield. The bonding strips were attached to the "incoming ignition wires," meaning the outer concentric shields on the ignition wires, which shows, of course, that the purpose was to make the current return along the shield. This was the "low resistance return path."

To say the least, when we take what the Marconi publication taught, together with what the Lefroy patent taught, we cannot avoid the conclusion that Crook's invention was not new. From the Lefroy patent and the Marconi publication Crook, or another person skilled in the art, could have learned that radio interference might be prevented by returning the current from the spark plug to the magneto by way of the inner surface of the shield surrounding the wires leading from the positive pole of the magneto to the spark plug; and he

603

could have learned, too, that it was not essential that both terminals of the spark plug should be insulated.

As we said in our former opinion, the provision for the return of the current along the walls of the structure enclosing the wires from the magneto to the spark plugs was the feature that distinguished the Crook patent from the prior art and was an essential part of it. Since the Lefroy patent and the Marconi publication together, if not each alone, had previously taught this, Crook's invention was not new.

In view of this newly discovered evidence, we are obliged to hold that Crook's patent had been anticipated by the prior art and was, therefore, invalid.

Plaintiffs' petition will be dismissed.